# EXHIBIT A

# EXHIBIT A

**Pleadings asserting causes of action, e.g., petitions, counterclaims, cross actions, third-party actions, interventions and all answers to such pleadings.** *See* LR 81(2).

1. Plaintiffs' First Amended Petition, filed August 29, 2014

2. Plaintiffs' Original Petition, filed May 13, 2013

Received and E-Filed for Record
8/29/2014 2:26:41 PM
Barbara Gladden Adamick
District Clerk
Montgomery County, Texas

**CAUSE NO. 13-0505121-W**

| | | |
|---|---|---|
| **CONRAD P. MARCOTTE AND SHARON L. MARCOTTE,** **Plaintiffs** | § § § | **IN THE DISTRICT COURT OF** |
| **v.** | § § § | |
| **BANK OF AMERICA; BARCLAYS BANK PLC; SHR IILUXURY CONDIMINIUMS a/k/a SH II LUXURY CONDOMINIUMS a/k/a; SHR II LUXURY CONDOS; SUNSET HARBOR RESORT; SUNSET HARBOR RESORTS; AND SUNSET HARBOR HOA SA.** **Defendants** | § § § § § § § § § | **MONTGOMERY COUNTY TEXAS** <br> <br> **284th JUDICIAL DISTRICT** |

**PLAINTIFFS' FIRST AMENDED PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs Conrad P. Marcotte and Sharon L. Marcotte and file this Amended Petition complaining of Defendants Bank of America, Barclays Bank PLC, SHR II Luxury Condominium Association, Inc. a/k/a SHR II Luxury Condominiums and/or SH II Luxury Condominiums and/or SHR II Luxury Condos, Sunset Harbor II Luxury Condominiums, a Condominium Regime; Sunset Harbor Resort; Sunset Harbor Resorts, and Sunset Harbor HOA SA, and for their cause of action would show the Court as follows:

**DISCOVERY**

1. Discovery shall be conducted under level 3.

**PARTIES, JURISDICTION AND VENUE**

2. Plaintiffs are residents of the state of Kansas.

3. Defendant Bank of America is a foreign National Banking Association doing business in Texas. It may be served by serving its registered agent for the state of Texas, CT

Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136. Upon information and belief, its principal office in the state of Texas is located in Dallas, Texas.

4. Defendant Barclays Bank PLC is a foreign financial institution doing business in the state of Texas. It may be served by serving its registered agent for the state of Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136. Upon information and belief, its principal office in the state of Texas is located in Dallas, Texas.

5. Defendant SHR II Luxury Condominium Association, Inc. a/k/a SHR Luxury Condominiums a/k/a SH II Luxury Condominiums and/or SHR II Luxury Condos ("SHR II") is a Texas Corporation that has been served by serving its registered agent for the state of Texas, Debbie Buckley, 7041 Kingston Cove Lane, Unit 251, Willis, Texas 77318. According to the Texas Secretary of State web site, SHR II's corporate charter was forfeited by the Texas Secretary of State on February 8, 2013.

6. Upon information and belief "Sunset Harbor Resort" and "Sunset Harbor Resorts" are assumed or fictitious names used by SHR II.

7. Defendant Sunset Harbor HOA SA is a homeowner's association in Texas. Plaintiff does not know if it has a registered agent in Texas. It may be served by serving the Texas Secretary of State.

8. Defendant Sunset Harbor II Luxury Condominiums is a condominium regime created by William B. Mitchell, and has been served by serving William B. Mitchell at 10814 Laurel Creek Drive, Austin, Texas 78726.

9. Venue is proper in Montgomery County because of the ongoing lawsuit and the original defendants are located there, the real property subject to the charges of these banks is located there and that both Bank of America and Barclays Bank PLC have been aware of this

existing suit , given copies of the Original Petition and despite repeated demands have wholly failed to take any action as regards their ongoing refusal to remove Plaintiffs from their credit card and credit records because of the fraud involved in the initiation of that credit card and subsequent charges and because both banks have offices that are located in Montgomery County, Texas.

**FACTS**

10. Plaintiff Conrad P. Marcotte is 78 years old. Plaintiff Sharon L. Marcotte is 75. They live in Wichita, Kansas.

11. In 1991, Plaintiffs purchased a time share in a condominium development in Branson, Missouri called Surrey (the "Surrey time share"). Over the next 21 years, Plaintiffs used the Surrey time share only once. They regretted the purchase, because they could not sell it, and had to continue pay yearly maintenance fees on the time share.

12. In 2012, Plaintiffs responded to an advertisement promising relief from the monetary burden of the time share. Paul Klinger, an agent of Defendants, contacted Plaintiffs in response to their inquiry. Klinger set up a meeting with Plaintiffs at a restaurant in Wichita, Kansas on June 19, 2012.

13. Klinger's pitch was a classic bait and switch. He induced Plaintiffs to meet him on the premise that he could do something to help them with the monetary burden of the Surrey time share. That was not was he was really selling. Klinger told Plaintiffs about a company called Point Rental Liquidators ("PRL"). Klinger represented to Plaintiffs that PRL could rent out Plaintiffs' Surrey time share to other persons and generate more than enough income through rentals to pay Plaintiffs' annual maintenance fees. This piqued Plaintiffs' interest, because Plaintiffs were tired of paying maintenance fees on a time share they never used.

14. However, Klinger eventually informed the Plaintiffs that there was a catch. In order to take advantage of the PRL rental program, Klinger told Plaintiffs that they also had to first buy another time share through SHR II, also known as the Sunset Harbor Resort, for $9,800.00. When Plaintiffs told Klinger they had no interest in buying another time share, Klinger assured them that the PRL rental program would not only generate enough rental income to pay the yearly maintenance fees for the Surrey time share, but that PRL also would rent out the SHR II time share to other persons, and that the rental income would be sufficient to pay off the $9,800.00 price of the SHR II time share within one year's time, and pay the SHR II annual maintenance fees. Klinger represented to the Plaintiffs that if they bought an SHR II time share, and signed up for the PRL program, the PRL rental program would generate $12,500.00 in rental income for the Plaintiffs for the first year.

15. Desiring a way to get out from under the Surrey time share maintenance fees, the Plaintiffs bought into Klinger's sales pitch, and agreed to purchase an SHR II time share for $9,800.00, and signed up for the PRL rental program, believing based on Klinger's representations, that the PRL rental program would pay off the $9,800.00 within a year, and also generate sufficient rental income to pay the yearly maintenance fees for both the Surrey and SHR II time shares.

16. On June 19, 2012, Plaintiffs signed a one page contract to purchase an SHR II time share, and at the same time and as part of the same transaction with Klinger, signed a one page PRL Guaranteed Points Rental Agreement with respect to both the SHR II time share and the Surrey time share. The PRL agreement is a three part agreement between Plaintiffs, PRL and SHR II. SHR II actually was the entity that charged Plaintiffs' credit card $498.00 for the PRL

Guaranteed Points Rental Agreement, despite the fact that Plaintiffs only gave PRL an authorization to charge their credit card this fee.

17. As part of the deal, the Plaintiffs would receive "points" that could be used either to have use of the time share property, or Plaintiffs had the option of transferring their points to PRL so that PRL could rent the Plaintiffs' time shares to third parties to generate rental income. Plaintiffs agreed to transfer their points to PRL so that it could generate rental income. The PRL Guaranteed Points Rental Agreement states:

> I understand that by transferring my points to PRL, Inc., that I am GUARANTEED to receive my fair share of the rental income generated by the rental pool. Based on recent years, and corporate accounts, our future projections are for rental pools to pay out from 8.5¢-8.75¢ per point.
>
> ***
>
> Rental Pool payouts are figured and paid out quarterly on the 15 of the month after each quarter. The payout quarter for each individual client is the first full quarter 6 months after the points are transferred to PRL.

This is what induced Plaintiffs to enter into the deal with PRL and SHR II – the promise of rental income that would offset the price paid to SHR II for the time share, and the annual maintenance fees for both the SHR II time share and the Surrey time share. The PRL rental agreement was the essential part of the transaction from Plaintiffs' perspective. Without that part of the deal, the Plaintiffs never would have agreed to the other part of the deal – the purchase of an SHR II condominium.

18. Plaintiffs' agreement to purchase the SHR II contained a Right to Cancel Clause, which read in part as follows:

> (1) By signing this contract, you are incurring an obligation to purchase a timeshare interest. You may, however, cancel this contract without penalty or obligation before the sixth day after the date you sign and receive a copy of the purchase contract, or receive the required timeshare disclosure statement, whichever is later.

As discussed in further detail below, Plaintiffs never received a document entitled "timeshare disclosure statement," or any document that in any way identified itself as a "timeshare disclosure statement," or that in any way informed Plaintiff that the document was, in fact, the "timeshare disclosure statement" referenced in the Right to Cancel provision. For that reason, Plaintiffs retained the right to cancel the contract without penalty.

19. In dealing with Plaintiffs, Klinger also acted as an agent of Bank of America in soliciting customers for Bank of America's RCI® Elite Rewards® credit card. "RCI" is a timeshare vacation exchange that timeshare owners may use to trade the use of their time share for different timeshares by accruing points, which also may be used to obtain other vacation related benefits.. Klinger, acting as an agent of Bank of America, signed Plaintiffs up and obtained approval for Plaintiffs' to obtain a Bank of America RCI® Elite Rewards® credit card. Plaintiffs signed an authorization permitting "SH II Luxury Condominiums" to charge the $9,800.00 fee for the time share to this credit card. However, an entity named "Sunset Harbor HOA SA" actually charged this amount to the credit card. Plaintiffs have no idea what this entity is, and did not authorize this entity to charge their credit card. Bank of America's agent Klinger processed this unauthorized charge.

20. After the transaction on 06.19.12 was completed, several things occurred that eventually led to Plaintiffs sending a letter cancelling the time share contract. First, as noted above, an entity other than the entity Plaintiffs contracted with charged the time share fee to Plaintiffs' Bank of America RCI® Elite Rewards® Credit Card.

21. Then, Plaintiffs did not receive from SHR II a deed to the time share until after November 27, 2012. The deed was purportedly signed by Debbie Berra on August 15, 2012.

22. Then, on or about December 13, 2012, Plaintiffs received a second deed from SHR II for the time share that allegedly was signed by Debbie Berra on September 4, 2012. This second deed contained a different property description than the August 15, 2012 deed. Moreover, although this deed was purportedly signed by Debbie Berra, the signature is completely different than the Debbie Berra signature on the August 15, 2012 deed. In addition, there is no notary seal on the second deed.

23. In addition, Plaintiffs did not receive any rental income from PRL under the PRL Guaranteed Points Rental Agreement, and further learned that SHR II had terminated its relationship with PRL.

24. At that point, Plaintiffs sent a letter via certified mail cancelling the contract with SHR II. Plaintiffs also notified Bank of America about the unauthorized charge to the Bank of America RCI® Elite Rewards® Credit Card.

25. Plaintiffs also have learned that the corporate charter of SHR II was forfeited by the Texas Attorney General on February 8, 2013.

26. Despite Plaintiffs' complaint about the unauthorized charge to their credit card by Bank of America's agent Klinger, Bank of America refused to take action to remove the credit card charge from Plaintiffs' account.

27. Barclays Bank PLC acquired Plaintiff's credit card account from Bank of America. Barclays Bank was made aware of the unauthorized $9,800.00 charge. Barclays refused to take action to remove the credit card charge from Plaintiffs' account and has continued to attempt to collect the $9,800.00 unauthorized charge from Plaintiffs, plus interest and late fees.

28. Defendants SHR II Luxury Condominium Association, Inc. a/k/a SHR II Luxury Condominiums and/or SH II Luxury Condominiums and/or SHR II Luxury Condos, Sunset Harbor II Luxury Condominiums, a Condominium Regime; Sunset Harbor Resort; Sunset Harbor Resorts, and Sunset Harbor HOA SA (collectively referred to as "Sunset Harbor" or the "Sunset Harbor Defendants") have admitted there was fraud and misrepresentation. In the written settlement statement signed by an official representative of Sunset Harbor, these Defendants admitted and acknowledged that:

> Sunset Harbor agrees that representations and promises were made to the Marcottes by representatives of R&R Ventures [Klinger, who also was acting as Bank of America's agent by soliciting Plaintiffs to sign up for a credit card to use for their time share purchase], who at that time were agents of Sunset Harbor, and such representations were not true.
>
> Sunset Harbor further agrees that the Marcottes relied on these representations and promises of R&R ventures when they entered into the agreement to purchase a timeshare from Sunset Harbor.

29. Defendants admitted and acknowledged that: Sunset Harbor agrees to having the Marcottes return the timeshare deed to the Sunset Harbor and that the Marcottes will be removed from the ownership of the timeshare and will be released from having to pay any homeowner's dues and maintenance fees, past, present or future, to Sunset Harbor or any other entity.

In addition the Marcottes are released from any and all other obligations as a homeowner of a timeshare at Sunset Harbor.

Lastly, Sunset Harbor agrees to pay $200.00 a month to the Marcottes until the $9,800.00 purchase price that the Marcottes paid for the timeshare has been fully refunded to them in full. The Marcottes may assign their right to receive the refund payments to a third-party if they so choose.

30. The Sunset Harbor Defendants thereafter failed to make any of the $200.00 per month payments to Plaintiffs.

## CAUSE OF ACTION –FRAUD IN A REAL ESTATE TRANSCTION

31. Plaintiffs would show that:

(1) Defendants' agent Paul Klinger made false representations of a past or existing material fact, when the false representation was:

(A) made to Plaintiffs for the purpose of inducing them to enter into the contract; and

(B) relied on by Plaintiffs in entering into that contract; and

(2) Klinger falsely promised that PRL and/or SHR II would do an act, when the false promise was

(A) material;

(B) made with the intention of not fulfilling it;

(C) made to Plaintiffs for the purpose of inducing them to enter into the contract; and

(D) relied on by Plaintiff's in entering into that contract.

32. Specifically, Klinger misrepresented that Plaintiffs would receive rental income from PRL that would offset the cost of the SHR II time share, the annual maintenance fee for the SHR II time share and the annual maintenance fee for the Surrey time share. He made this misrepresentation to induce Plaintiffs to enter into a time share contract with SHR II. Plaintiffs relied on this misrepresentation when they entered into the contract. As a result of such misrepresentation Plaintiffs suffered actual damages. Plaintiffs seek recovery of their actual damages under Section 27.01 of the Texas Bus. & Com. Code.

33. Part of Klinger's fraudulent scheme involved inducing Plaintiffs to sign up for the Bank of America RCI® Elite Rewards® Credit Card, which he then used to charge the $9,800.00 payment for the time share. Klinger was acting as an agent of Bank of America when fraudulently induced Plaintiffs to sign up for this credit card. This fraud on the part of Klinger also proximately caused Plaintiffs to suffer actual damages.

34. Plaintiffs further seek recovery of exemplary damages under Section 27.01 from Defendants because the false representations and false promises made by Defendants' agent Klinger were made with actual awareness of the falsity.

35. Plaintiffs further seek recovery under Section 27.01 of their reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

**CAUSE OF ACTION – COMMON LAW FRAUD**

36. Plaintiffs would show that:

(1) Defendants' agent Paul Klinger made material representations to Plaintiffs;

(2) that were false;

(3) when Klinger made the representations he knew they were false or made them recklessly without knowledge of the truth and as a positive assertion;

(4) Klinger made the representations intending to induce Plaintiffs to act on them;

(5) Plaintiff acted in reasonable reliance on the representations; and

(6) Plaintiffs suffered injury as a result of their reliance.

37. Part of Klinger's fraudulent scheme involved inducing Plaintiffs to sign up for the Bank of America RCI® Elite Rewards® Credit Card, which he then used to charge the $9,800.00 payment for the time share. Klinger was acting as an agent of Bank of America when fraudulently induced Plaintiffs to sign up for this credit card.

38. As a result of this fraud on the part of Defendants, Plaintiffs suffered actual damages as a result of their reliance on Defendants' misrepresentations, for which Plaintiffs seek recovery.

**CAUSE OF ACTION – THEFT AND CONVERSION**

39. Defendant Sunset Harbor HOA SA unlawfully appropriated funds from Plaintiffs, with the intent to deprive Plaintiffs of said funds, by charging $9,800.00 on Plaintiffs' credit card, when Plaintiffs never authorized Sunset Harbor HOA SA to charge any amount on their credit card. Sunset Harbor HOA SA thereby committed theft and conversion. Said theft and conversion on the part of Sunset Harbor HOA SA caused Plaintiffs' to suffer actual damages, for which Plaintiffs seek recovery under Section 134.001 et seq. of the Texas Civil Practice and Remedies Code and under the common law cause of action for conversion.

40. Plaintiffs further seek recovery of their reasonable and necessary attorney's fees from Sunset Harbor HOA SA under Section 134.005 of the Texas Civil Practice and Remedies Code.

41. Plaintiffs further seek recovery of the $1,000.00 penalty provided for in Section 134.005 of the Texas Civil Practice and Remedies Code.

42. Plaintiffs further seek recovery of uncapped exemplary damages from Sunset Harbor HOA SA under Section 41.001 et. seq. of the Texas Civil Practice and Remedies Code because of the theft committed by this entity.

**BREACH OF CONTRACT**

43. Defendants SHR II Luxury Condominium Association, Inc. a/k/a SHR II Luxury Condominiums and/or SH II Luxury Condominiums and/or SHR II Luxury Condos, Sunset Harbor II Luxury Condominiums, a Condominium Regime; Sunset Harbor Resort; Sunset Harbor Resorts, and Sunset Harbor HOA SA (collectively referred to as "Sunset Harbor" or the "Sunset Harbor Defendants") entered into a settlement agreement with Plaintiffs. As part of that settlement agreement, the Sunset Harbor Defendants agreed to pay Plaintiffs $200.00 per month

for 49 months. The Sunset Harbor Defendants have not made any of the $200.00 monthly payments and have thereby breached the contract. Plaintiffs have suffered actual damages as a result of said breach. All conditions precedent have been performed or have occurred.

44. Plaintiffs seek recovery of their reasonable and necessary attorney's fees from the Sunset Harbor Defendants under Section 38.001 of the Texas Civil Practice and Remedies Code.

**DECLARATORY JUDGMENT**

45. Plaintiffs seek a declaratory judgment against Bank of America and/or Barclays Bank under 15 U.S.C. § 1643, which provides:

(a) Limits on liability

**(1)** A cardholder shall be liable for the unauthorized use of a credit card only if--

**(A)** the card is an accepted credit card;

**(B)** the liability is not in excess of $50;

**(C)** the card issuer gives adequate notice to the cardholder of the potential liability;

**(D)** the card issuer has provided the cardholder with a description of a means by which the card issuer may be notified of loss or theft of the card, which description may be provided on the face or reverse side of the statement required by section 1637(b) of this title or on a separate notice accompanying such statement;

**(E)** the unauthorized use occurs before the card issuer has been notified that an unauthorized use of the credit card has occurred or may occur as the result of loss, theft, or otherwise; and

**(F)** the card issuer has provided a method whereby the user of such card can be identified as the person authorized to use it.

**(2)** For purposes of this section, a card issuer has been notified when such steps as may be reasonably required in the ordinary course of business to provide the card issuer with the pertinent information have been taken, whether or not any particular officer, employee, or agent of the card issuer does in fact receive such information.

(b) Burden of proof

> In any action by a card issuer to enforce liability for the use of a credit card, the burden of proof is upon the card issuer to show that the use was authorized or, if the use was unauthorized, then the burden of proof is upon the card issuer to show that the conditions of liability for the unauthorized use of a credit card, as set forth in subsection (a) of this section, have been met.

(c) Liability imposed by other laws or by agreement with issuer

> Nothing in this section imposes liability upon a cardholder for the unauthorized use of a credit card in excess of his liability for such use under other applicable law or under any agreement with the card issuer.

(d) Exclusiveness of liability

> Except as provided in this section, a cardholder incurs no liability from the unauthorized use of a credit card.

46. Plaintiffs never authorized Sunset Harbor HOA SA to charge any amount on their Bank of America RCI® Elite Rewards® Credit Card. Thus, the $9,800.00 charge on the card made by Sunset Harbor HOA SA was an unauthorized use of the card for purposes of Section 1643. Plaintiffs seek a declaratory judgment that they have no liability for the $9,800.00 charge on the card made by Sunset Harbor HOA SA or for any of the interest and late fee charges because Bank of America:

(1) did not provide adequate notice to Plaintiffs of the potential liability under Section 1643; and

(2) did not provide the Plaintiffs with a description of a means by which the Bank of America could be notified of loss or theft of the card.

47. Pleading in the alternative, in the event Defendant Bank of American can prove that it provided adequate notice to Plaintiffs as required by Section 1643, Plaintiffs seek a declaratory judgment that under Section 1643, the maximum amount of liability they have for the $9,800.00 unauthorized charge on the card is $50.00.

48. Plaintiffs seek recovery from Defendants Bank of America and Barclays Bank for their attorney's fees incurred in prosecuting their declaratory judgment claims under Section 37.009 of the Texas Civil Practice and Remedies Code.

**VIOLATION OF THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT**

49. Defendants Bank of America and Barclays Bank have violated the federal Fair Debt Collection Practices Act by attempting to collect from Plaintiffs all of the $9,800.00 that was charged to Plaintiffs' Bank of America RCI® Elite Rewards® Credit Card after said Defendants were made aware that this was an unauthorized charge made by Sunset Harbor HOA SA. Under 15 U.S.C. § 1692f, a debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt, which includes collecting any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law. In this case the $9,800.00 charge on the card made by Sunset Harbor HOA SA was not expressly authorized by Plaintiffs, and not permitted to be charged to Plaintiffs, or at most, only $50.00 of could be charged to Plaintiffs under the circumstances. Defendants have violated Section 1692f by attempting to collect the full amount of the $9,800.00 charge from Plaintiffs, when Defendants were made aware that Sunset Harbor HOA SA was never authorized to make this charge by Plaintiffs, and when Defendants Bank of America and Barclays Bank were made aware of the fraudulent scheme perpetrated by the Sunset Harbor Defendants to induce Plaintiffs to pay the $9,800.00 for the time share, to which these Defendants admitted in the settlement agreement with Plaintiffs.

50. Plaintiffs seek recovery under 15 U.S.C. § 1692k for their actual damages resulting from Defendants' unfair or unconscionable means to collect a debt, additional damages of $1,000.00 and their reasonable and necessary attorney's fees incurred in bringing this claim.

**EXEMPLARY DAMAGES**

51. Plaintiffs are entitled to recover exemplary damages from the Sunset Harbor Defendants under Section 41.001 et. seq. of the Texas Civil Practice and Remedies Code because Defendants' actions were done with the specific intent to cause injury to Plaintiffs, or alternatively, constituted fraud.

**DEMAND FOR JURY TRIAL**

52. Plaintiffs demand a jury trial.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear, and that upon final trial, Plaintiffs have and recover judgment from and against Defendants for:

(1) actual damages;

(2) exemplary damages;

(3) additional damages under 15 U.S.C. § 1692k against Bank of America and Barclays Bank;

(4) additional damages under 134.005 of the Texas Civil Practice and Remedies Code against Sunset Harbor HOA SA;

(5) reasonable and necessary attorney's fees;

(6) a declaratory judgment that Plaintiffs have no liability for the $9,800.00 unauthorized charge on their credit card, or alternatively, a declaratory judgment that their maximum liability for this charge is $50.00;

(7) that all costs of court be taxed be taxed against Defendants;

(8) expert witness fees and costs for copies of depositions under Section 27.01 of the Texas Bus. & Com. Code;

(9) post judgment and prejudgment interest as allowed by law; and

(10) such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

By: /E/ Robert Wood

Robert C.C. Wood, Esq.
Texas State Bar No. 21914500
One Meadows Building
5005 Greenville Avenue, Suite 200
Dallas, Texas 75206
(214) 369-3209 (office)
(214) 363-1559 (facsimile)
Rccwood@aol.com
ATTORNEY FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon the Parties of the opposing side, in accordance with the Texas Rules of Civil Procedure on the 29th day of August, 2014.

/e/ Robert Wood

ROBERT WOOD

RECEIVED & FILED FOR RECORD
BARBARA GLADDEN ADAMICK DISTRICT
CLERK, MONTGOMERY COUNTY, TEXAS

2013 MAY 13 PM 12:52

BY [signature] DEPUTY

CAUSE NO. 13-05-05121-CV

| | | |
|---|---|---|
| CONRAD P. MARCOTTE AND SHARON L. MARCOTTE, Plaintiffs | § | IN THE DISTRICT COURT OF |
| v. | § | MONTGOMERY COUNTY |
| SHR II LUXURY CONDOMINIUM ASSOCIATION, INC. a/k/a SHR II LUXURY CONDIMINIUMS a/k/a SH II LUXURY CONDOMINIUMS a/k/a; SHR II LUXURY CONDOS; SUNSET HARBOR RESORT; SUNSET HARBOR RESORTS; AND SUNSET HARBOR HOA SA. Defendants | § | 284th JUDICIAL DISTRICT |

**PLAINTIFFS' ORIGINAL PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs Conrad P. Marcotte and Sharon L. Marcotte and file this Original Petition complaining of Defendants SHR II Luxury Condominium Association, Inc. a/k/a SHR II Luxury Condominiums and/or SH II Luxury Condominiums and/or SHR II Luxury Condos, Sunset Harbor II Luxury Condominiums, a Condominium Regime; Sunset Harbor Resort; Sunset Harbor Resorts, and Sunset Harbor HOA SA, and for their cause of action would show the Court as follows:

**DISCOVERY**

1. Discovery shall be conducted under level 3.

**PARTIES, JURISDICTION AND VENUE**

2. Plaintiffs are residents of the state of Kansas.

3. Defendant SHR II Luxury Condominium Association, Inc. a/k/a SHR Luxury Condominiums a/k/a SH II Luxury Condominiums and/or SHR II Luxury Condos ("SHR II") is

SCANNED

a Texas Corporation that may be served by serving its registered agent for the state of Texas, Debbie Buckley, 7041 Kingston Cove Lane, Unit 251, Willis, Texas 77318. According to the Texas Secretary of State web site, SHR II's corporate charter was forfeited by the Texas Secretary of State on February 8, 2013.

4. Upon information and belief "Sunset Harbor Resort" and "Sunset Harbor Resorts" are assumed or fictitious names used by SHR II.

5. Upon information and belief, Defendant Sunset Harbor HOA SA may be a fictitious name used by SHR II. There is no registration for this name with the Texas Secretary of State.

6. Defendant Sunset Harbor II Luxury Condominiums is a condominium regime created by William B. Mitchell, and may be served by serving William B. Mitchell at 10814 Laurel Creek Drive, Austin, Texas 78726.

7. The real property that is the subject of this lawsuit is located in Montgomery County, Texas, and the Defendant's principal office is located in Montgomery County, and for that reason venue is proper in Montgomery County, Texas.

**FACTS**

8. Plaintiff Conrad P. Marcotte is 77 years old. Plaintiff Sharon L. Marcotte is 74. They live in Wichita, Kansas.

9. In 1998, Plaintiffs purchased a time share in a condominium development in Branson, Missouri called Surrey (the "Surrey time share"). Over the next 15 years, Plaintiffs used the Surrey time share only once. They regretted the purchase, because they could not sell it, and had to continue pay increasing yearly maintenance fees on the time share.

10. In 2012, Plaintiffs responded to an advertisement for relief from the monetary burden of the time share. Paul Klinger, an agent of Defendants, met with Plaintiffs in response to their inquiry. Klinger set up a meeting with Defendants at a restaurant in Wichita, Kansas on June 19, 2012.

11. Klinger's pitch was a classic bait and switch. He induced Plaintiffs to meet him on the premise that he could do something to help them with the ongoing monetary burden of the Surrey time share. That was not what he was really selling. Klinger told Plaintiffs about a company called Point Rental Liquidators ("PRL"). Klinger represented to Plaintiffs that PRL could rent out Plaintiffs' Surrey time share to other persons and generate more than enough income through rentals to pay Plaintiffs' annual maintenance fees on the Surrey time share. This piqued Plaintiffs' interest, because Plaintiffs were tired of paying maintenance fees on a time share they never used.

12. However, Klinger eventually informed the Plaintiffs that there was a catch. In order to take advantage of the PRL rental program, Klinger told Plaintiffs that they also had to first buy another time share from SHR II, also known as the Sunset Harbor Resort, for $9,800.00. When Plaintiffs told Klinger they had no interest in buying another time share, Klinger assured them that the PRL rental program would not only generate enough rental income to pay the yearly maintenance fees for the Surrey time share, but that PRL also would rent out the SHR II time share to other persons, and that the rental income would be sufficient to pay off the $9,800.00 price of the SHR II time share within one year's time, and pay the SHR II annual maintenance fees. Klinger represented to the Plaintiffs that if they bought an SHR II time share, and signed up for the PRL program, the PRL rental program would generate $12,580.00 in rental income for the Plaintiffs for the first year.

13. Desiring a way to get out from under the Surrey time share maintenance fees, the Plaintiffs bought into Klinger's sales pitch, and agreed to purchase an SHR II time share for $9,800.00, and signed up for the PRL rental program, believing based on Klinger's representations, that the PRL rental program would pay off the $9,800.00 within a year, and also generate sufficient rental income to pay the yearly maintenance fees for both the Surrey and SHR II time shares.

14. On June 19, 2012, Plaintiffs signed a one page contract to purchase an SHR II time share, and at the same time and as part of the same transaction with Klinger, signed a one page PRL Guaranteed Points Rental Agreement with respect to both the SHR II time share and the Surrey time share. The PRL agreement is a three part agreement between Plaintiffs, PRL and SHR II.

15. As part of the deal, the Plaintiffs would receive "points" that could be used either to have use of the time share property, or Plaintiffs had the option of transferring their points to PRL so that PRL could rent the Plaintiffs' time shares to third parties to generate rental income for Plaintiffs. Plaintiffs agreed to transfer their points to PRL so that it could generate rental income. The PRL Guaranteed Points Rental Agreement states:

> I understand that by transferring my points to PRL, Inc., that I am GUARANTEED to receive my fair share of the rental income generated by the rental pool. Based on recent years, and corporate accounts, our future projections are for rental pools to pay out from 8.5¢-8.75¢ per point.
>
> ***
>
> Rental Pool payouts are figured and paid out quarterly on the 15 of the month after each quarter. The payout quarter for each individual client is the first full quarter 6 months after the points are transferred to PRL.

This is what induced Plaintiffs to enter into the deal with PRL and SHR II – the promise of rental income that would offset the price paid to SHR II for the time share, and the annual maintenance fees for both the SHR II time share and the Surrey time share. The PRL rental agreement was the essential part of the transaction from Plaintiffs' perspective. Without that part of the deal, the Plaintiffs never would have agreed to the other part of the deal – the purchase of an SHR II condominium.

16. Plaintiffs' agreement to purchase the SHR II contained a Right to Cancel Clause, which read in part as follows:

> (1) By signing this contract, you are incurring an obligation to purchase a timeshare interest. You may, however, cancel this contract without penalty or obligation before the sixth day after the date you sign and receive a copy of the purchase contract, or receive the required timeshare disclosure statement, whichever is later.

As discussed in further detail below, Plaintiffs never received a document entitled "timeshare disclosure statement," or any document that in any way identified itself as a "timeshare disclosure statement," or that in any way informed Plaintiff that the document was, in fact, the "timeshare disclosure statement" referenced in the Right to Cancel provision. For that reason, Plaintiffs retained the right to cancel the contract without penalty.

17. As part of the deal with Plaintiffs, Klinger also had Plaintiffs approved for a credit card through Bank of America. Plaintiffs signed an authorization permitting "SH II Luxury Condominiums" to charge the $9,800.00 fee for the time share to the new Bank of America credit card. However, an entity named "Sunset Harbor HOA SA" actually charged this amount to the credit card. Plaintiffs have no idea what this entity is, and did not authorize this entity to charge their credit card.

18. After the transaction on 06.19.12 was completed, several things occurred that eventually led to Plaintiffs sending a letter cancelling the time share contract. First, as noted

above, an entity other than the entity Plaintiffs contracted with charged the time share fee to Plaintiffs' Bank of America Credit Card.

19. Then, Plaintiffs did not receive from SHR II a deed to the time share until after November 27, 2012. The deed was purportedly signed by Debbie Berra on August 15, 2012. The deed falsely states that it was accepted by Grantee as of August 15, 2012. Plaintiffs never accepted this deed.

20. Then, on or about December 13, 2012, Plaintiffs received a second deed from SHR II for the time share that allegedly was signed by Debbie Berra on September 9, 2012. This second deed contained a different property description than the August 15, 2012 deed. Moreover, although this deed was purportedly signed by Debbie Berra, the signature is completely different than the Debbie Berra signature on the August 15, 2012 deed. In addition, there is no notary seal on the second deed, nor was it recorded. This deed also falsely states that it was accepted by Grantee as of September 9, 2012. Plaintiffs never accepted the deed.

21. In addition, Plaintiffs did not receive any rental income from PRL under the PRL Guaranteed Points Rental Agreement. PRL never even contacted the people at Surrey about renting Plaintiffs' Surrey time share. On or about November 27, 2012, Plaintiffs further learned that SHR II had terminated its relationship with PRL, and would soon be replacing PRL with another company. Plaintiffs never learned from SHR II who that other company was.

22. On December 21, 2012, Plaintiffs sent a letter via certified mail cancelling the contract with SHR II. Plaintiff received a response to the cancellation letter dated January 4, 2013 from Tom Turner with SHR II which stated:

> We are in receipt of your letter dated December 21, 2012. We would very much like to discuss your problems with you, however your letter did not include a phone number. Please call me at your earliest convenience.

Plaintiffs have received no further communication from SHR II.

23. Plaintiffs also have learned that the corporate charter of SHR II was forfeited by the Texas Attorney General on February 8, 2013.

**CAUSE OF ACTION – RESCISSION OF THE CONTRACT**

24. Plaintiffs seek a declaratory judgment that their cancellation of the contract was a valid cancellation and rescinding their contract with SHR II. The contract provided that Plaintiffs could cancel before the sixth day after receiving a timeshare disclosure statement. Plaintiffs never received a timeshare disclosure statement. Plaintiffs sent a letter exercising their right of cancellation on December 21, 2012.

25. In connection with the rescission of the contract, Plaintiffs further seek a refund of the $9,800.00 they paid to SHR II under the time share purchase contract, and $168.00 charged to Plaintiffs by SRH II for the annual maintenance fee. Plaintiffs further seek a refund of the $498.00 that SHR II charged to Plaintiffs for the PRL Guaranteed Points Rental Agreement, which was part and parcel of the time share purchase contract.

26. Plaintiffs seek recovery of their reasonable and necessary attorney's fees under Sections 37.009 and/or 38.001 of the Texas Civil Practice and Remedies Code.

**CAUSE OF ACTION – FRAUD IN A REAL ESTATE TRANSCTION**

27. Plaintiffs would show that:

(1) Defendant's agent Paul Klinger made false representations of a past or existing material fact, when the false representation was

(A) made to Plaintiffs for the purpose of inducing them to enter into the contract; and
(B) relied on by Plaintiffs in entering into that contract; and

(2) Klinger falsely promised that PRL and/or SHR II would do an act, when the false promise was

(A) material;

(B) made with the intention of not fulfilling it;
(C) made to Plaintiffs for the purpose of inducing them to enter into the contract; and
(D) relied on by Plaintiff's in entering into that contract.

28. Specifically, Klinger misrepresented that Plaintiffs would receive rental income from PRL that would offset the cost of the SHR II time share, the annual maintenance fee for the SHR II time share and the annual maintenance fee for the Surrey time share. He made this misrepresentation to induce Plaintiffs to enter into a time share contract with SHR II. Plaintiffs relied on this misrepresentation when they entered into the contract. As a result of such misrepresentation Plaintiffs suffered actual damages. Plaintiffs seek recovery of their actual damages under Section 27.01 of the Texas Bus. & Com. Code.

29. Plaintiffs further seek recovery of exemplary damages under Section 27.01 from Defendants because the false representations and false promises made by Defendants' agent Klinger were made with actual awareness of the falsity.

30. Plaintiffs further seek recovery under Section 27.01 of their reasonable and necessary attorney's fees, expert witness fees, costs for copies of depositions, and costs of court.

**CAUSE OF ACTION – COMMON LAW FRAUD**

31. Plaintiffs would show that:

(1) Defendant's agent Paul Klinger made material representations to Plaintiffs;

(2) that were false;

(3) when Klinger made the representations he knew they were false or made them recklessly without knowledge of the truth and as a positive assertion;

(4) Klinger made the representations intending to induce Plaintiffs to act on them;

(5) Plaintiff acted in reasonable reliance on the representations; and

(6) Plaintiffs suffered injury as a result of their reliance.

32. In the alternative, Plaintiffs seek rescission of the contract because they were fraudulently induced to enter into it by Klinger. Plaintiffs seek recovery of the actual damages they suffered as a result of their reliance on Klinger's misrepresentations.

**CAUSE OF ACTION – THEFT AND CONVERSION**

33. Defendant Sunset Harbor HOA SA unlawfully appropriated funds from Plaintiffs, with the intent to deprive Plaintiffs of said funds, by charging $9,800.00 on Plaintiffs' Bank of America credit card, when Plaintiffs never authorized Sunset Harbor HOA SA to charge any amount on this credit card. Sunset Harbor HOA SA thereby committed theft and conversion. Said theft and conversion on the part of Sunset Harbor caused Plaintiffs' to suffer actual damages, for which Plaintiffs seek recovery under Section 134.001 et seq. of the Texas Civil Practice and Remedies Code and under the common law cause of action for conversion.

34. Plaintiffs further seek recovery of their reasonable and necessary attorney's fees from Sunset Harbor HOA SA under Section 134.005 of the Texas Civil Practice and Remedies Code.

35. Plaintiffs further seek recovery of the $1,000.00 penalty provided for in Section 134.005 of the Texas Civil Practice and Remedies Code.

36. Plaintiffs further seek recovery of uncapped exemplary damages from Sunset Harbor HOA SA under Section 41.001 et. seq. of the Texas Civil Practice and Remedies Code because of the theft committed by this entity.

**EXEMPLARY DAMAGES**

37. Plaintiffs are entitled to recover exemplary damages from all Defendants under Section 41.001 et. seq. of the Texas Civil Practice and Remedies Code because Defendants'

actions were done with the specific intent to cause injury to Plaintiffs, or alternatively, constituted fraud.

**DEMAND FOR JURY TRIAL**

38. Plaintiffs demand a jury trial.

**DISCOVERY**

39. Attached hereto as Exhibit A are Plaintiffs' Requests for Disclosure to Defendants, Plaintiffs' First Set of Interrogatories to Defendants, and Plaintiffs' Request for Production to Defendants, which are being served with this Original Petition. The time given to respond to the requests for disclosure, interrogatories and requests for production only applies to these discovery requests, and does not apply to the time within which the Original Petition must be answered, which is governed by Citation served with the Original Petition.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear, and that upon final trial, Plaintiffs have and recover judgment from and against Defendants for:

(1) a declaratory judgment validating Plaintiffs' cancellation of the contract with SHR II, and rescinding the time share purchase contract and deed;

(2) a refund of the $9,800 purchase price, the $168.00 maintenance fee, the $498.00 fee charged to Plaintiffs by SHR II for the PRL Guaranteed Points Rental Agreement;

(3) all actual damages suffered by Plaintiffs as a result of the fraud perpetrated by Defendants;

(4) exemplary damages;

(5) reasonable and necessary attorney's fees;

(6) expert witness fees;

(7) costs for copies of depositions;

(8) post judgment and prejudgment interest as allowed by law;

(9) costs of Court; and

(10) such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show themselves justly entitled.

Respectfully submitted,

By: ____________________

Robert C.C. Wood, Esq.
Texas State Bar No. 21914500
One Meadows Building
5005 Greenville Avenue, Suite 200
Dallas, Texas 75206
(214) 369-3209 (office)
(214) 363-1559 (facsimile)

ATTORNEY FOR PLAINTIFFS

**EXHIBIT A**

**REQUESTS FOR DISCLOSURE TO DEFENDANTS**

Defendants SHR Luxury Condominium Association, Inc. a/k/a SHR II Luxury Condominiums and/or SH II Luxury Condominiums and/or SHR II Luxury Condos, Sunset Harbor II Luxury Condominiums, a Condominium Regime; Sunset Harbor Resort; Sunset Harbor Resorts, and Sunset Harbor HOA SA are requested to disclose the following information and documents pursuant to Rule 194.2 and Rule 194.3 of the Texas Rules of Civil Procedure within fifty (50) days of being served with the Original Petition to which this discovery is attached:

A. the correct names of the parties to the lawsuit;

B. the name, address, and telephone number of any potential parties;

C. the legal theories and, in general, the factual basis of all the responding party's claims or defenses;

D. the amount and any method of calculating economic damages;

E. the name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified persons' connection with the case;

F. for each testifying expert:

1. the expert's name, address and telephone number;

2. the subject matter on which the expert will testify;

3. the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

4. if the expert is retained by, employed by or otherwise subject to the control of the responding party;

a. All documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by or prepared by for the expert in anticipation of the expert's testimony; and

b. The expert's current resume and bibliography;

G. any indemnity and insuring agreements described in TRCP 192.3 (f);

H. any settlement agreements described in TRCP 192.3 (g);

I. any witness statement described in TRCP 192.3(h);

J. the name, address and telephone number of any person who may be designated as a responsible third party.

All documents produced in conjunction with these disclosures should be produced at the law offices of Robert Wood, 5005 Greenville Avenue, Suite 200, Dallas, Texas 75206.

**REQUESTS FOR PRODUCTION TO DEFENDANTS**

Defendant SHR II Luxury Condominium Association, Inc. a/k/a SHR II Luxury Condominiums and/or SH II Luxury Condominiums and/or SHR II Luxury Condos ("SHR II"), Sunset Harbor II Luxury Condominiums, a Condominium Regime; Sunset Harbor Resort; Sunset Harbor Resorts, and Sunset Harbor HOA SA are requested to serve responses to the following requests for production and produce the requested documents within fifty (50) days of being served with the Original Petition to which this discovery is attached. Certain terms herein have definitions that are defined below. All documents produced in conjunction with the requests for production should be produced at the law offices of Robert Wood, 5005 Greenville Avenue, Suite 200, Dallas, Texas 75206.

**A. Definitions**

1. The term "Document" or "Written Material" as used herein shall be defined as the original of all materials, and each non-identical copy (whether different from the original because of marginal notes, or other material inserted therein, or attached thereto or otherwise) written or graphic matter, however produced or reproduced, whether sent or received, or neither, including drafts and both sides thereof, and including, but not limited to, printed typewritten,

handwritten, and computer printed or written matter, and mechanical, magnetic and electronic recordings and shall include, without limitation, letters, telegrams, cablegrams, telex messages, TWX messages, correspondence, notations, work papers, transcripts, minutes, reports, records of telephone or other conversations, or of interviews, conferences or other meetings, maps, charts, plans, specifications, diagrams, photographs, affidavits, statements, statistical diagrams, records, lists, tabulations, memoranda, notes, diaries, calendars, calendar tabulations, calendar pads, appointment books or records, reports, worksheets, printed business forms, expense account reports or records, contracts, agreements, letters of credit, bids, quotations, proposals, canceled checks, bank statements, deposit slips, bills, invoices, statements and other books, records, papers, copies, and drafts and proposed forms of any of such items or matters, or tapes, disks, sound records, computer printouts, data processing input and output, microfilm, microfiche, all other records kept by electronic, photographic, or mechanical means, and items similar to all of the foregoing which were prepared by or for you, or which are in or subject to your possession, custody, or control. If any tape, disk, card, wire, or other electronic or mechanical recording or transcript or any computer program is produced, you shall also produce such documents as are necessary for decoding, playing back, printing out, and/or interpretation thereof, and any other documents which are necessary to convert such information into a useful and usable format. If you can demonstrate that the original is unavailable, the term "Written Material" also includes a copy of the original.

2. The term "time share" refers to the time share property in Montgomery County, Texas that Plaintiffs contracted to purchase from SHR II on or about June 19, 2012.

3. "PRL Guaranteed Points Rental Agreement" refers to the PRL Guaranteed Points Rental Agreement that Plaintiffs entered into on June 19, 2012 at the same time they entered into the time share purchase contract. A true and correct copy of this agreement is attached hereto as Exhibit B.

4. The "SHR II time share purchase contract" is attached hereto as Exhibit C.

**B. Requests for Production**

1. All contracts and agreements, including addendums, exhibits, and attachments, between Plaintiffs and Defendants relating in any way to the time share.

2. All contracts and agreements relating to Point Rental Liquidators ("PRL") to which Plaintiffs were a party, including without limitation the PRL Guaranteed Points Rental Agreement.

3. All contracts and agreements between Defendants and PRL that were in effect at any time from January 1, 2012 to present.

4. All documents signed by Plaintiffs that in any way relate to their purchase of the time share.

5. The Timeshare Disclosure Statement referenced in Exhibit A attached to the SHR time share purchase contract between Plaintiff and SHR II.

6. All documents showing that Plaintiffs received a copy of the Timeshare Disclosure Statement, and the date on which Plaintiffs received that document.

7. All documents showing that Plaintiff authorized Sunset Harbor HOA SA to charge any amounts on Plaintiffs' Bank of America credit card, or any credit card, including without limitation, the $9,800.00 time share fee for the SHR II time share.

8. The corporate or company charters, by-laws, formation documents, organization documents, and condominium declarations for the following:

SHR II Luxury Condominium Association, Inc.
SHR II Luxury Condominiums
SH II Luxury Condominiums
SHR II Luxury Condos
Sunset Harbor II Luxury Condominiums, a Condominium Regime
Sunset Harbor Resort
Sunset Harbor Resorts
Sunset Harbor HOA SA

9. All documents pertaining to the business relationship between Defendants and PRL.

10. All contracts and agreements between Defendants and RCI, Inc. that were in effect on January 1, 2012.

11. All documents pertaining to the business relationship between Defendants and RCI, Inc.

12. All documents that pertain in any way to the following:

a. Plaintiffs' contract to purchase the time share; and

b. The PRL Guaranteed Points Rental Agreement signed by Plaintiffs on 06.19.12.

13. All documents evidencing written or oral communications between Plaintiffs and Defendants relating to the time share, including without limitation, letters, emails, notes, transcripts of telephone or in person conversations.

14. All documents evidencing written or oral communications between Plaintiffs and Defendants relating to the PRL Guaranteed Points Rental Agreement that Plaintiffs entered into on June 19, 2012 in conjunction with the time share contract, including without limitation, letters, emails, notes, transcripts of telephone or in person conversations.

15. All documents pertaining to the termination of the relationship between Defendants and PRL.

16. All documents relating to why the PRL Guaranteed Points Rental Agreement was not honored or performed.

17. All documents evidencing written or oral communications between Defendants and PRL for the period between January 1, 2011 and present relating to any time shares owned or sold by Defendants, or relating to any agreement or business relationship between Defendants and PRL.

18. All documents relating to the forfeiture of the charter of any of the following:

Defendants SHR Luxury Condominium Association, Inc.
SHR II Luxury Condominiums
SH II Luxury Condominiums
SHR II Luxury Condos
Sunset Harbor II Luxury Condominiums, a Condominium Regime
Sunset Harbor Resort
Sunset Harbor Resorts
Sunset Harbor HOA SA

19. For the period from January 1, 2008 to present, all documents relating to any and all lawsuits or arbitrations filed against Defendants by person(s) who purchased time shares from Defendants at the Sunset Harbor Resort, including without limitation, all petitions, answers, discovery, motions, responses to motions, and judgments.

20. For the period from January 1, 2008, all documents constituting, evidencing, relating to or containing any information concerning all complaints filed against any of the Defendants by any person with any governmental agency, or with the Better Business Bureau.

21. All documents showing rental revenue generated by PRL with respect to time share units at the Sunset Harbor Resort for the period from January 1, 2008 to present.

22. All documents showing rental revenue generated by PRL with respect to all of its rentals of time share units at all facilities for which it rented units for the period from January 1, 2008 to present.

23. All agreements between SHR II and Bank of America that relate to assisting time share purchasers to obtain credit cards through Bank of America.

24. All deeds conveying property from SHR II to Plaintiffs relating to the time share.

25. All documents relating to Defendants' relationship with Paul Klinger.

26. All documents showing that Defendants were authorized to charge any maintenance fees on any of Plaintiffs' credit cards.

27. All documents showing that Defendant SHR II was authorized to charge the $498.00 fee for the PRL Guaranteed Points Rental Agreement on any of Plaintiffs' credit cards.

28. All documents relating to Defendant's relationship with the following:

Debbie Berra
Tom Turner
William B. Mitchell
Debbie Buckley
Candace Peeler

29. For the past five years, all of Defendants' filings with the Texas Secretary of State, including without limitation, charters, certificates of formation, organization and formation documents, assumed name documents, periodic public information reports, reinstatement of charter documents.

30. All assumed name certificates or documents filed by any of the Defendants in Montgomery County, Texas.

31. All assumed name certificates or documents filed by any of the Defendants in any other Texas County.

32. All contracts and agreements between Defendants and R & R Ventures that were in effect at any time from January 1, 2012 to present.

33. All contracts and agreements between R & R Ventures and PRL that were in effect at any time from January 1, 2012 to present.

34. All contracts and agreements between Defendants and the company Defendants hired to replace R & R Ventures and/or PRL.

35. All documents pertaining to the business relationship between Defendants and R & R Ventures.

36. All documents pertaining to the business relationship between Defendants and the company that replaced R & R Ventures and/or PRL.

37. All documents showing that PRL, the company Defendants hired to replace PRL and/or Defendants contacted someone at the Surrey time share facility regarding renting out Plaintiffs' Surrey time share to generate rental income for Plaintiffs pursuant to the PRL Guaranteed Points Rental Agreement.

38. All documents showing that PRL, the company Defendants hired to replace PRL and/or Defendants made any efforts to rent out the SHR II time share to generate rental income for Plaintiffs pursuant to the PRL Guaranteed Points Rental Agreement.

**INTERROGATORIES TO DEFENDANTS**

Defendants SHR II Luxury Condominium Association, Inc. a/k/a SHR II Luxury Condominiums and/or SH II Luxury Condominiums and/or SHR II Luxury Condos ("SHR II"), Sunset Harbor II Luxury Condominiums, a Condominium Regime; Sunset Harbor Resort; Sunset Harbor Resorts, and Sunset Harbor HOA SA are requested to serve responses to the following interrogatories, under oath, within fifty (50) days of being served with the Original Petition to which this discovery is attached. Certain terms herein have definitions that are defined below.

**A. Definitions**

1. The term "Document" or "Written Material" as used herein shall be defined as the original of all materials, and each non-identical copy (whether different from the original because of marginal notes, or other material inserted therein, or attached thereto or otherwise) written or graphic matter, however produced or reproduced, whether sent or received, or neither, including drafts and both sides thereof, and including, but not limited to, printed typewritten, handwritten, and computer printed or written matter, and mechanical, magnetic and electronic recordings and shall include, without limitation, letters, telegrams, cablegrams, telex messages, TWX messages, correspondence, notations, work papers, transcripts, minutes, reports, records of telephone or other conversations, or of interviews, conferences or other meetings, maps, charts, plans, specifications, diagrams, photographs, affidavits, statements, statistical diagrams, records, lists, tabulations, memoranda, notes, diaries, calendars, calendar tabulations, calendar pads, appointment books or records, reports, worksheets, printed business forms, expense account reports or records, contracts, agreements, letters of credit, bids, quotations, proposals, canceled checks, bank statements, deposit slips, bills, invoices, statements and other books, records, papers, copies, and drafts and proposed forms of any of such items or matters, or tapes, disks, sound records, computer printouts, data processing input and output, microfilm, microfiche, all other records kept by electronic, photographic, or mechanical means, and items similar to all of the foregoing which were prepared by or for you, or which are in or subject to your possession, custody, or control. If any tape, disk, card, wire, or other electronic or mechanical recording or transcript or any computer program is produced, you shall also produce such documents as are necessary for decoding, playing back, printing out, and/or interpretation thereof, and any other documents which are necessary to convert such information into a useful and usable format. If you can demonstrate that the original is unavailable, the term "Written Material" also includes a copy of the original.

2. The term "time share" refers to the time share property in Montgomery County, Texas that Plaintiffs contracted to purchase from SHR II on or about June 19, 2012.

3. "PRL Guaranteed Points Rental Agreement" refers to the PRL Guaranteed Points Rental Agreement that Plaintiffs entered into on June 19, 2012 at the same time they entered into the

time share purchase contract, and for which they were charged $498.00, which SHR II charged to Plaintiffs' credit card. A true and correct copy of this agreement is attached hereto as Exhibit

4. The "SHR II time share purchase contract" is attached hereto as Exhibit C.

5. "Identify" with respect to a person means to state the person's name, last known residential and business address, last known personal and business telephone number, name of person's last known employer, the employer's last known address and telephone number, and the person's position with their last known employer.

**B. Interrogatories**

1. Identify all persons who received, reviewed, handled and/or processed for or on behalf of Defendants:

(a) Plaintiffs' contract to purchase the time share;
(b) any of the documents signed by Plaintiffs relating to the time share contract;
(c) any correspondence between Plaintiffs and Defendants;
(d) credit card charges that were charged by any of the Defendants to Plaintiffs' Bank of America credit card, or any other credit card;
(e) furnishing a Time Share Disclosure Statement to Plaintiffs;
(f) the PRL Guaranteed Points Rental Agreement;
(g) the activation of Plaintiffs' RCI account;
(h) arrangements by PRL or any other company to rent the Surrey time share to generate rental income for Plaintiffs.

For each person identified, also provide the position they held with Defendants.

2. Identify each and every person who purchased a time share from SHR II at the Sunset Harbor Resort.

3. Identify each and every person who purchased a time share from SHR II at the Sunset Harbor Resort who also entered into an agreement with PRL.

4. Identify all persons who are employed by or affiliated in any way with Defendants who have knowledge of:

(a) Plaintiffs' contract to purchase the time share;
(b) any of the documents signed by Plaintiffs relating to the time share contract;
(c) any correspondence from Plaintiff;
(d) credit card charges that were charged by any of the Defendants to Plaintiffs' Bank of America credit card, or any other credit card;
(e) furnishing a Time Share Disclosure Statement to Plaintiffs;
(f) the PRL Guaranteed Points Rental Agreement;

(g) Defendant's business relationship and/or arrangement with R & R Ventures and/or PRL at the time Plaintiffs' signed the PRL Guaranteed Points Rental Agreement.

5. For the period from January 1, 2011 to present, identify all persons who were employed by or affiliated in any way with PRL with whom Defendants had communications regarding:

(a) the business relationship between PRL and Defendants; and
(b) signing up SHR II time share purchasers to Guaranteed Points Rental Agreements or similar agreements with PRL.

6. Were Plaintiffs required to purchase an SHR II time share in order to be able to sign up for the PRL Guaranteed Points Rental Agreement for their Surrey time share, and if so, why?

7. Did SHR II's business relationship with R & R Ventures and/or PRL terminate? If so, when did it terminate and why did it terminate? If it did not terminate, why have Plaintiffs not received any rental income under the terms of the PRL Guaranteed Points Rental Agreement?

8. Describe all efforts made to rent out the SHR II time share and/or Plaintiffs' Surrey time share pursuant to the PRL Guaranteed Points Rental Agreement.