**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CONRAD P. MARCOTTE and | § | |
| SHARON L. MARCOTTE, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-2773 |
| | § | |
| BANK OF AMERICA, | § | |
| BARCLAYS BANK PLC, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Conrad and Sharon Marcotte, the plaintiffs, bought a timeshare in a condominium in Missouri in the early 1990s.  They rarely used it and found it financially burdensome.  When Paul Klinger, a salesperson, offered them an opportunity to escape timeshare ownership in 2012, they enthusiastically accepted.  The Marcottes allege that Klinger convinced them that he could help them if they purchased *another* timeshare, this one for a condominium in Texas, using an RCI Elite Rewards credit card issued and serviced by Bank of America.  The rental proceeds from the new purchase, Klinger told the Marcottes, would exceed their yearly dues and maintenance expenses for both timeshares.

The Marcottes agreed to purchase the second timeshare using the new credit card, charging a downpayment of $9,800.  They eventually received a deed to the timeshare, but they were suspicious because they received conflicting documents and the credit-card charge was posted to a seller with a different name than the seller they had contracted with.  The Marcottes cancelled the timeshare contract within the time period their contract allowed and notified Bank of America that

1

the $9,800 charge was unauthorized.   Bank of America refused to remove the charge and sold the account to Barclays Bank Delaware ("Barclays").   The Marcottes asked Barclays to remove the charge, but it, too, refused and sought to collect the unpaid charge along with interest and late fees. The Marcottes sued the Texas timeshare companies in state court and reached a settlement with them.   The Marcottes then amended their petition to add Bank of America and Barclays as parties, alleging violations of state and federal law.

Barclays timely removed on the basis of federal-question jurisdiction, and Bank of America consented.   Both banks have moved to dismiss the Marcottes' claims against them.   (Docket Entry No. 36, 37).   For the reasons stated below, the court grants both motions.   This case is dismissed by separate order.

## I.      Background

In 1991, Conrad and Sharon Marcotte purchased a timeshare for a condo in Branson, Missouri.   (Docket Entry No. 35, ¶ 14).   They rarely used the property but had to maintain it.   (*Id.*). In June 2012, the Marcottes saw an advertisement promising relief from the financial burdens of timeshare ownership, including their annual maintenance fees.   The Marcottes responded to the advertisement and were contacted by Paul Klinger.   Klinger worked for R&R Ventures, which had been hired by Sunset Harbor Resorts[1] "to market and sell time shares at their condominium resort in Montgomery County, Texas."   (*Id.* ¶ 14, 16).

Klinger met with the Marcottes and told them that he could help with the financial burdens of their Missouri timeshare by renting it through a company called Point Rental Liquidators

---

[1] The Marcottes named several "Sunset Harbor" defendants, including Sunset Harbor Resort, Sunset Harbor Resorts, Sunset Harbor HOA, SHR II Luxury Condominiums, and SHR II Luxury Condos.   For simplicity, the court refers to these defendants as "Sunset Harbor Resorts" unless otherwise noted.   (*See* Docket Entry No. 35, ¶ 19 (referring to "SHR II" as "also known as Sunset Harbor Resort")).

("PRL").  But Klinger said he could do this only if the Marcottes bought a new timeshare through Sunset Harbor Resort ("SHR") II Luxury Condominiums, for $9,800.  The Marcottes agreed because of Klinger's representations that the rental program would generate enough income from both timeshares to cover their annual maintenance fees and pay off the new Sunset Harbor timeshare in one year.  (*Id.* ¶¶ 18-19).

On June 19, 2012, the Marcottes signed a contract with SHR II Luxury Condominiums to purchase the Sunset Harbor timeshare.  They also signed a rental agreement with PRL and SHR II Luxury Condominiums agreeing to have PRL rent both the Missouri and Texas timeshares.  (*Id.* ¶ 21).  To pay for the second timeshare, Klinger had the Marcottes apply for, and use, a new Bank of America RCI Elite Awards credit card.  The Marcottes allege that Bank of America "ratified Klinger's actions by accepting the credit card application from him, approving [them] for the credit card[,] and accepting the $9,800.00 charge to the card."  (*Id.* ¶ 25).  They also allege that Klinger "was acting as an agent of Bank of America as part of his scheme to fraudulently induce" them to "buy the Sunset Harbor time share" with a Bank of America credit card.  (*Id.* ¶ 26).

When the Marcottes applied for the Bank of America credit card, they signed an authorization  permitting "SHR II Luxury Condominiums" to charge $9,800 to the card.  Instead, they allege, an entity named "Sunset Harbor HOA SA" charged this amount to their card.  They contend that they did not authorize this charge, that Klinger should not have processed it, and that Bank of America should not have accepted it.  (*Id.* ¶¶ 27, 28, 29).

Several months later, on November 27, 2012, the Marcottes received the deed to the timeshare they had purchased in June from Sunset Harbor Resorts.  (*Id.* ¶ 30).  On December 13, 2012, they received a second deed, listing a property with a different description than the description

in their contract.  The second deed was signed with a different signature by a Sunset Harbor representative with the same name as the one who signed the first deed.  The Marcottes never received any rental income from PRL.  (*Id.* ¶ 32).  Shortly after receiving the second deed, the Marcottes sent a letter to Sunset Harbor cancelling their timeshare purchase.  The timeshare Purchase Agreement allowed  them to "cancel [the] contract without penalty or obligation before the sixth day after" the later of "the date [they] sign[ed] and received a copy of the purchase contract, or receive[d] the required timeshare disclosure statement."  (Docket Entry No. 35, ¶ 23 (quoting the Purchase Agreement)).  The Marcottes met the deadline and were able to cancel.  The Marcottes notified Bank of America that they contested the $9,800 charge made on their Bank of America credit card.  (*Id.* ¶ 33).  On August 26, 2013, Bank of America sent the Marcottes a letter refusing to remove the charge from their account and informing them that the account had been sold to Barclays in June 2013.  (*Id.* ¶ 36 & Ex. B).  The Marcottes received the letter on September 3, 2013.  They allege that this was the first notice that Barclays had acquired their account.  (*Id.*).  The Marcottes notified Barclays about the unauthorized $9,800 charge, which it also refused to remove. The Marcottes allege that Barclays has sent them monthly statements seeking to recover the unpaid amount, but under the names "RCI" and "Barclaycard.US.com," not "Barclays Bank PLC."  (*Id.* ¶ 38).

In May 2013, the Marcottes sued the Sunset Harbor defendants, including Sunset Harbor HOA and SHR II Luxury Condominiums, in Texas state court.  (Docket Entry No. 1-2 at 19).  These defendants signed a settlement agreement with the Marcottes in which they admitted that Klinger's "representations and promises" "were not true" and agreed to refund the $9,800, paying $200 each month.  (Docket Entry No. 35, Ex. A).  In exchange, the Marcottes would "return the deed to the

HOA" and would "be removed from the ownership of the timeshare and . . . released from having to pay any homeowner's dues past, present[,] or future, to" Sunset Harbor Resorts. (*Id.*). According to the Marcottes, these defendants never honored the settlement agreement. On August 28, 2014, the state trial court dismissed the Marcottes' action against these defendants for failure to prosecute. (Docket Entry No. 1-4, at 7).

On August 29, 2014, the Marcottes filed an amended state petition naming Bank of America, Barclays, SHR II Luxury Condominiums, and the Sunset Harbor Resort entities as defendants. (Docket Entry No. 1-2).[2]  On September 12, 2014, the court reinstated the Marcottes' case, but the Marcottes served only Bank of America and Barclays with the amended petition. (Docket Entry No. 1, at 2; 1-4, at 8). The Marcottes asserted claims against Bank of America for: (1) statutory fraud, in violation of Tex. Bus. & Comm. Code § 27.01; (2) common-law fraud; (3) a declaratory judgment of no liability for the $9,800 credit-card charge and interest, under 15 U.S.C. § 1643 of the Truth in Lending Act ("TILA"); and (4) violating the Fair Debt Collection Practices Act ("FDCPA"). (Docket Entry No. 1-2). The Marcottes alleged that when Barclays acquired their credit-card account from Bank of America, it violated (1) the Truth in Lending Act and (2) the Fair Debt Collection Practices Act.[3]  (*Id.*). Removal and the first motions to dismiss followed. (Docket Entry No. 20, 25).  The plaintiffs responded to the motions, including by dropping their Fair Debt Collection Practices Act claim against Bank of America. (Docket Entry No. 24, at 2). On December 17, 2014, the court held a hearing on the motions to dismiss, granting both without prejudice and

---

[2]  The Marcottes allege that they filed suit against Bank of America and Barclays on August 27, not August 29, 2014.  (Docket Entry No. 35, ¶ 36).

[3]  The Marcottes' petition also asserted claims against the Sunset Harbor defendants (SHR II Luxury Condominiums, *et al.*) for theft and conversion and for breaching the settlement agreement.  (Docket Entry No. 1-2 at 15-16).

with leave to amend.  (Docket Entry No. 33).

The Marcottes filed an additional response to the motions to dismiss and a second amended complaint.  (Docket Entry Nos. 34, 35).  The second amended complaint asserts causes of action for: (1) fraud in a real estate transaction, against the Sunset Harbor defendants; (2) common-law fraud, against Bank of America and the Sunset Harbor defendants; (3) theft and conversion, against the Sunset Harbor defendants; (4) breach of contract, against the Sunset Harbor defendants; (5) unauthorized use of the Marcottes' credit card, in violation of the Truth in Lending Act, against Bank of America and Barclays; and (6) unlawful collection, in violation of the Fair Debt Collection Practices Act, against Barclays.  (Docket Entry No. 35).   The Marcottes seek monetary and declaratory relief.  (Docket Entry No. 35, at 26).  Bank of America and Barclays have again moved to dismiss, arguing that the Marcottes' claims against them fail as a matter of law.  (Docket Entry Nos. 36, 37).  The Marcottes did not respond.  The Marcottes did not serve the Sunset Harbor defendants.

Based on a careful review of the pleadings; the motions, response, and reply; the record; and the applicable law, the court grants Bank of America's and Barclays's motions to dismiss, and enters a partial order of dismissal.  The reasons for this ruling are explained in detail below.

## II.    The Legal Standard for a Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  A complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556

6

U.S. 662 (2009).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at 556).

To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "'a formulaic recitation of the elements of a cause of action will not do.'"  *Norris v. Hearst Trust*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).  "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief — including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'"  *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (footnote omitted) (quoting *Twombly*, 550 U.S. at 555).  "Conversely, 'when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'"  *Id.* (quoting *Twombly*, 550 U.S. at 558).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile.  *See Great Plains Trust Co. v. Morgan*

7

*Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.").  However, a plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F. App'x 534, 535 (5th Cir. 2007) ("'[A] district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imps, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))). *Manor Assocs. v. City of Houston*, 816 F. Supp. 2d 394, 404 n.5 (S.D. Tex. 2011).

Under Federal Rule of Civil Procedure 15(a), a district court "should freely give leave [to amend] when justice so requires."  FED. R. CIV. P. 15(a)(2).  "[T]he language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (internal quotation marks omitted).  Although leave to amend should not be automatically granted, "[a] district court must possess a substantial reason to deny a request for leave to amend[.]" *Id.* (internal quotation marks omitted).  Under Rule 15(a), "[d]enial of leave to amend may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of a proposed amendment." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010).  A proposed amendment is futile if "the amended complaint would fail to state a claim upon which relief could be granted." *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 873 (5th Cir.

2000).   "[T]he same standard of legal sufficiency as applies under Rule 12(b)(6)" applies to determining futility.   *Id.* (internal quotation marks omitted).

## III.   Analysis

Bank of America argues that the Marcottes' second amended complaint fails to state a claim against it for common-law fraud.   Both Bank of America and Barclays argue that the amended complaint fails to state a claim against them for declaratory relief under the Truth in Lending Act. Finally, Barclays argues that the amended complaint fails to state a claim against it under the Fair Debt Collection Practices Act.

### A.   The Common-Law Fraud Claim against Bank of America

The Marcottes' second amended complaint alleges that Klinger, acting as Bank of America's agent, fraudulently induced them into signing the Purchase Agreement for the Texas timeshare, applying for a Bank of America credit card to pay for the new timeshare, and charging the card for an unauthorized payee, Sunset Harbor HOA.   (Docket Entry No. 35, ¶¶ 47-54).   The elements of fraud under Texas law are "(1) a [material] misrepresentation that (2) the speaker knew to be false or made recklessly (3) with the intention to induce the plaintiff's reliance, followed by (4) actual and justifiable reliance (5) causing injury."   *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners*, L.P., 620 F.3d 465, 468 (5th Cir. 2010) (citing *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).   Federal Rule of Civil Procedure 9(b) requires pleadings to "state with particularity the circumstances constituting the fraud."   FED. R. CIV. P. 9(b).   "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out."   *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) ("In cases concerning fraudulent misrepresentation and omission

of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading.").  When, as here, the issue is whether an entity is liable as the principal of the person who allegedly made the fraudulent statements, the plaintiffs must "plead with the particularity required under Rule 9(b) facts showing that when [the alleged agent] had [the plaintiff] sign the . . . loan and guaranty documents, [the alleged agent] acted as [the defendant's] actual or apparent agent."  *Whitney Nat'l Bank v. Med. Plaza Surgical Ctr. L.L.P.*, No. CIV.A. H-06-1492, 2007 WL 400094, at *4 (S.D. Tex. Feb. 1, 2007).

The second amended complaint alleges that Klinger, while acting as Bank of America's agent, made material misrepresentations about their timeshare purchase in June 2012 that induced them to apply for, and charge $9,800 to, a Bank of America credit card.  (Docket Entry No. 35, ¶¶ 48-49).  Even assuming that the complaint sufficiently alleges that Klinger was acting as Bank of America's agent in having the Marcottes sign up for the credit card, the allegations of Klinger's material misrepresentations as Bank of America's agent fail as a matter of law.

The second amended complaint alleges that:

> Klinger told [the Marcottes] that they could pay for the Sunset Harbor time share by applying for the Bank of America's RCI Elite Rewards credit card, and using the card to pay the $9,800.00 price of the time share. . . . Klinger took [the Marcottes'] application for the Bank of America credit card, processed the application either over the telephone or online, obtained approval for [the Marcottes] to obtain[] the card and charged $9,800.00 to the credit card ostensibly to be used as payment for the Sunset Harbor time share.

(Docket Entry No. 35, ¶ 49).  This statement is not a misrepresentation because the Marcottes did pay for the Sunset Harbor timeshare using the newly issued credit card.  The plaintiffs allege that "Klinger, as Bank of America's agent, misrepresented to [the Marcottes] that the Bank of America

credit card charge would be paid to SHR II Luxury Condominiums, when it actually was paid to a separate and different entity, Sunset Harbor HOA SA."  (Docket Entry No. 35, ¶ 52).  But the complaint does do not allege with particularity how Klinger acted as Bank of America's agent in assigning their payment to the wrong seller.  The Marcottes neither dispute that they received a deed to the timeshare nor that they authorized the amount charged to the card.

The allegations that Klinger materially misrepresented the Sunset Harbor timeshare, Point Rental Liquidators, and the seller that would receive the credit-card payment are not sufficiently alleged to have been made by a Bank of America agent and cannot be imputed to Bank of America on that basis.  *See Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) (affirming the dismissal of state-law fraud claims against CAM and CEC because the plaintiff "failed to allege in his complaint facts to support his assertion that . . . an officer and director of CAM and CEC . . . acted on behalf of those companies when he drafted" the allegedly fraudulent document issued by a third company; noting that "[e]ven if [the officer] were liable for fraud involving [that third company], CAM and CEC are not liable for fraud merely because one of their officers committed fraud while wearing a different corporate hat").

The Marcottes allege that Bank of America "ratified Klinger's actions by accepting the credit card application from him, approving [them] for the credit card[,] and accepting the $9,800.00 charge to the card."  (Docket Entry No. 35, ¶ 50).  They allege that "[a]n integral part of Klinger's scheme to fraudulently induce [them] to purchase the Sunset Harbor timeshare involved Bank of America's RCI Elite Rewards credit card program" and that they "would not have agreed to buy the time share had Klinger not also induced them to charge the price [of] the time share to the Bank of America RCI credit card."  (*Id.*, ¶ 49).  Bank of America's alleged role does not, without more,

11

subject it to liability for Klinger's alleged misrepresentations.  *See Grant v. Turner*, 505 F. App'x 107, 109, 112 (3d Cir. 2012) (affirming district court's dismissal of RICO fraud claims brought against credit-card company defendants that provided "'point of sale' credit card financing to prospective victims of fraud," but reversing the dismissal of claims against other defendants who sold memberships in travel clubs and that allegedly "swindled Plaintiffs and those similarly situated by convincing Plaintiffs to buy memberships in various travel clubs and then never delivering the benefits that Plaintiffs were promised").

The second amended complaint fails to state a claim for common-law fraud against Bank of America.  This claim is dismissed, with prejudice, because further amendment would be futile.

### B.     The Truth in Lending Act Claims against Bank of America and Barclays

The Marcottes allege that although they signed a form allowing their credit card to be charged $9,800 to pay SHR II Luxury Condominiums, they did not authorize payment to Sunset Harbor HOA.  They seek damages in the amount their credit card was charged to pay for the Sunset Harbor timeshare—$9,800, plus accrued interest and late fees, and less the Truth in Lending Act's $50.00 minimum—from Bank of America and Barclays because they refused to remove the unauthorized charge from the credit-card account.  The Marcottes seek Truth in Lending Act damages or, alternatively, declaratory relief under the Act to prevent Bank of America and Barclays from holding them liable for this amount.  (Docket Entry No. 35, ¶¶ 66-67).  They also seek attorney's fees.  (*Id.*,  ¶ 68).

Bank of America and Barclays argue that these claims should be dismissed because: (1) the Marcottes lack standing to seek a declaratory judgment; (2) limitations bars their Truth in Lending Act claims; and (3) the $9,800 charge to Sunset Harbor HOA was not unauthorized.

1.      **Standing**

Bank of America argues that the Marcottes lack standing to pursue declaratory relief against it under the Truth in Lending Act because Bank of America no longer services their credit card account.  (Docket Entry No. 37, at 21).[4]  "In order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a plaintiff is seeking injunctive or declaratory relief, a plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future."  *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003).  "Based on the facts alleged, there must be a substantial and continuing controversy between two adverse parties."  *Id.*  "The plaintiff must allege facts from which the continuation of the dispute may be reasonably inferred."  *Id.*  "Additionally, the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury."  *Id.*  "[A] plaintiff must demonstrate either continuing harm or a real and immediate threat of repeated injury in the future."  *Id.*

The Marcottes do not allege that they paid Bank of America or Barclays any part of the $9,800 charge, accrued interest, or late payment fees.  The Marcottes lack standing to sue these defendants for damages under the Act.  *Cf. Smith v. Bank of Am. Home Loans*, 968 F. Supp. 2d 1159, 1166 (M.D. Fla. 2013) (allowing the plaintiffs to seek declaratory relief because they "clearly alleged that they have suffered actual harm by making unnecessary payments, and when payments were not made, they have suffered adverse credit consequences which have resulted in financial

---

[4]  Bank of America also argues that the Marcottes lack standing because they have not shown unauthorized use, (Docket Entry No. 37, at 21).  That argument goes to the merits rather than the threshold issue of whether there is a justiciable case or controversy.  Barclays does not argue that the Marcottes lack standing to seek a declaratory judgment against it.

harm").[5]  Nor have the Marcottes demonstrated a real and immediate threat that Bank of America will violate their rights under the Truth in Lending Act in the future.  Bank of America no longer owns or services their credit card account.  The Marcottes lack standing to pursue declaratory relief against Bank of America.

The Marcottes, however, have standing to assert claims under the Act against Barclays. Barclays owns and services their credit-card account.  The amended complaint alleges that "Barclays refused to take action to remove the credit card charge from Plaintiffs' account" once it acquired the account from Bank of America and "has continued to attempt to collect the $9,800.00 unauthorized charge from Plaintiffs, plus interest and late fees."  (Docket Entry No. 35, ¶ 37).  That alleges an ongoing threat to violate § 1643.  The Fifth Circuit has not addressed this issue in the context of a § 1643 claim, but courts in other circuits have recognized that cardholders have standing to seek declaratory relief under § 1643 to prevent collection of an outstanding allegedly unauthorized charge.  *See Maydak v. SeaFirst*, 108 F.3d 338, at *1 (9th Cir. 1997) (entertaining action under 15 U.S.C. § 1643 "seeking a declaratory judgment" that the plaintiff was "not responsible for" certain charges); *Towers World Airways Inc. v. PHH Aviation Sys. Inc.*, 933 F.2d 174, 175-76 (2d Cir. 1991) (entertaining cardholder's suit for "declaratory judgment" under 15 U.S.C. § 1643(a) and rejecting claim on the merits); *see also Asher v. Chase Bank USA, NA*, 310 F. App'x 912, 916 (7th

---

[5] Courts are split on whether plaintiffs who paid a disputed charge may seek reimbursement against the card issuer under § 1643.  *Compare Azur v. Chase Bank, USA, N.A.*, 601 F.3d 212, 217 & n.10 (3d Cir. 2010) (holding that "§ 1643 of the TILA does not provide the cardholder with a right to reimbursement"), *with  Minskoff v. Am. Exp. Travel Related Servs. Co., Inc.*, 98 F.3d 703, 707, 710 (2d Cir. 1996) (holding that the "appropriate resolution" on remand of a cardholder's § 1643 reimbursement claim is that "[the card issuer] is liable for [the user's] fraudulent purchases . . . from the time the credit card was issued until [the cardholder] received the first statement from [the card issuer] containing [the user's] fraudulent charges plus a reasonable time to examine that statement."), *and DBI Architects, P.C. v. Am. Express Travel–Related Servs. Co., Inc.*, 388 F.3d 886, 888, 894 (D.C. Cir. 2004) (remanding a cardholder's § 1643 reimbursement claim to determine at what point the cardholder created apparent authority in the fraudulent user).

Cir. 2009) ("Although the Truth in Lending Act does not state explicitly that a cardholder can bring a suit claiming a violation of 15 U.S.C. § 1643, the majority of other circuit and district courts faced with such a claim have assumed, on similar facts, the existence of a cardholder claim under § 1643." (citing cases)); *Smith*, 968 F. Supp. 2d at 1166 (holding that an actual controversy existed allowing the plaintiffs to seek declaratory relief because the "plaintiffs allege[d] that their debt has been extinguished, yet Bank of America continues to try to collect on the debt under a purported Superceding Note which is forged").

The Marcottes have standing to pursue a declaratory judgment that under the Truth in Lending Act, they are not liable to Barclays, their current credit-card account owner and servicer, for the allegedly unauthorized Sunset Harbor HOA charge, unless limitations bars the claim.

## 2.    Limitations

The Truth in Lending Act has a one-year statute of limitations.[6]  "A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003).  Claims under the Act must be brought "within one year from the date of the occurrence of the violation."  15 U.S.C. § 1640(e).

The parties dispute when a violation of the Truth in Lending Act occurred in this case. Barclays argues that any violation occurred on June 19, 2012, when the allegedly unauthorized $9,800 charge was put on the credit card.  The Marcottes argue that the violation occurred on September 3, 2012, when they received Bank of America's final letter refusing to remove the charge

---

[6] Both Barclays and Bank of America make this argument, but as discussed above, the Marcottes lack standing to seek declaratory relief against Bank of America.  The argument is addressed only as to Barclays.

and informing them that Barclays had acquired the account.

The Fifth Circuit has not yet ruled on when a § 1643 violation occurs. Other circuits are divided. The Sixth Circuit held in an unpublished opinion that a § 1643 violation occurs "with each unauthorized usage of the credit card." *Borg v. Chase Manhattan Bank USA, N.A.*, 892 F Supp. 1096, 1098 (6th Cir. 2007). The Northern District of Illinois reached the same result. *See Draiman v. Am. Express Travel Related Servs.*, 892 F Supp. 1096, 1098 (N.D. Ill. 1995) (rejecting the plaintiff's § 1643 claim as untimely because it accrued when his "account was charged for the El Al [airline] tickets"). These cases support the argument that the Marcottes' claim accrued when their credit-card account was charged for the allegedly unauthorized Sunset Harbor timeshare charge.

The Seventh Circuit has taken a contrary view that supports the Marcottes. In *Asher v. Chase Bank USA, N.A.*, 310 F. App'x 912 (7th Cir. 2009), the court concluded that a § 1643 claim accrues "when the card issuer notifies the cardholder that despite the cardholder's claim of fraud, the card issuer will not reimburse the cardholder for the disputed amount." *Id.* at 919. The court found the Sixth Circuit's reasoning

> . . . unpersuasive because a conclusion that § 1643 is violated when a sale transaction is "consummated" is inconsistent with TILA's statutory scheme, the Federal Reserve Board's interpretation of its Regulation Z, and the text of § 1643. The Sixth Circuit, in an unpublished and nonprecedential decision, and the Northern District of Illinois have both concluded, without much explanation, that a violation of § 1643 occurs when the unauthorized charge is made or posted. *Borg v. Chase Manhattan Bank USA*, 247 Fed. Appx. 627, 635 (6th Cir. 2007) (unpublished); *Draiman*, 892 F.Supp. at 1098. The case Chase cites for the proposition that a violation occurs when the transaction is consummated does not involve an action under § 1643 but rather the disclosures required for a mortgage loan. *Durham*, 2006 WL 3422183. *Durham* states that "[a] violation occurs when the credit transaction is consummated" and concludes that the transaction was consummated at the plaintiff's first closing on the loan. *Id.* at *4. The *Durham* court did not provide a citation for this proposition, perhaps because it is so well established in the context of loan contracts. *See Nash*,

16

703 F.2d at 238.   Tracing it back through the caselaw, however, the proposition stems from a provision in Regulation Z, Subpart C, on "closed-ended credit," and within the section addressing when a creditor must make disclosures required by TILA: "The creditor shall make disclosures before consummation of the transaction." 12 C.F.R. § 226.17(b).

But a creditor does not violate § 1643 by failing to make required disclosures, so a provision governing when they must be made is inapplicable.   Indeed, the Federal Reserve Board specifically provides in its commentary to the definition of "consummation," 12 C.F.R. § 226.2(a)(13), that the term does not apply to "sales": "[C]onsummation does not occur when the consumer becomes contractually committed to a sale transaction, unless the consumer also becomes legally obligated to accept a particular credit arrangement."   Federal Reserve Board Truth in Lending Official Staff Commentary to Regulation Z, 12 C.F.R. pt. 226, Supp. I § 226.2(a)(13)(2) (distinguishing consummation of credit versus sale transaction); *see Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981) (directing courts to defer to Board's regulations implementing TILA legislation and to its interpretation of those regulations).   Moreover, § 1643 is within Subpart B of Regulation Z, which governs "open-ended credit," and has a separate set of rules from those in Subpart C governing "closed-ended credit" (and an entirely different disclosure provision, though neither disclosure provision applies here).   *See* 12 C.F.R. § 226.12(b) (concerning "Special Credit Card Provisions" corresponding to the text of § 1643 and located within Subpart B of Regulation Z); *see also* 12 C.F.R. pt. 226, Table of Contents.

Finally, a conclusion that § 1643 is violated when the card is used or the transaction is posted is inconsistent with the text of § 1643. That section provides that a cardholder is liable for "unauthorized use" of the card only in specific circumstances. It seems a stretch to conclude that a card issuer violates the statute even before the cardholder has claimed that a particular use was unauthorized, much less before that claim has been investigated and rejected. It is more logical to conclude that a violation occurs when the card issuer notifies the cardholder that despite the cardholder's claim of fraud, the card issuer will not reimburse the cardholder for the disputed amount. Here, the violation occurred and the limitations period commenced when Chase notified Asher that it deemed him liable-for the final time, in January 2005. Asher's suit in September 2005 therefore is not time-barred.

*Id.* at 918-19 (parallel citations omitted).

Although neither *Asher* nor *Borg* is binding, *Asher* is the more persuasive in light of § 1643's text, structure, purpose, and implementing regulations. The Marcottes learned on September 3, 2013 that Barclays had acquired their credit-card account from Bank of America. That was the earliest

that the Marcottes could have received any decision on whether Barclays would refuse to remove the allegedly unauthorized charge.  *See Asher*, 310 F. App'x at 918.  The Marcottes sued Barclays less than one year later, in August 2014.  Their claim against Barclays is timely.

The next question is whether the use of the Marcottes' card was an "unauthorized use" actionable under the Truth in Lending Act.

### 3.    Unauthorized Use

The Act allows card issuers to hold cardholders liable "for the unauthorized use of a credit card" in limited circumstances, and in no event for more than $50.  *See* 15 U.S.C. § 1643(a)(1).  The statute defines "unauthorized use" as the "use of a credit card by a person other than the cardholder who does not have actual, implied, or apparent authority for such use and from which the cardholder receives no benefit." 15 U.S.C. § 1602(p); *DBI Architects, PC v. Am. Express Travel Related Servs. Co.*, 388 F.3d 886, 894 (D.C. Cir. 2004) ("use of a card is 'unauthorized' only if the cardholder derives no benefit from it and it lacks actual, implied, or apparent authority").  Barclays contends that the $9,800 charge cannot be unauthorized because: (1) the Marcottes, not a third party, approved the transaction; (2) even if Klinger is considered a third party, he had the Marcottes' authorization to make the charge; and (3) the Marcottes received the benefit they bargained for in exchange for the charge.[7]

### a.    Whether a third party used the Marcottes' card

The Marcottes, not Klinger, used their credit card.  After their application was processed, the Marcottes used the card to make the payment to purchase the Sunset Harbor timeshare.  Klinger

---

[7] Bank of America makes the same arguments, but, as discussed above, the Marcottes lack standing to pursue a Truth in Lending Act claim against Bank of America.  The court's analysis of arguments would apply equally to Bank of America.

helped the Marcottes apply for the card and execute the transaction, but he did not use the card. Under the Marcottes' approach, every department store employee who helps a shopper to open a new credit-card account to receive a discount on a new purchase could be considered a "use[r] of a credit card . . . other than the cardholder," and the shopper could challenge the purchase as unauthorized if the charge posted to an affiliated merchant with a slightly different name. *See* 15 U.S.C. § 1602(p).  Because there was no "use of a credit card by a person other than the cardholder[s]," the transaction was not "unauthorized."  *See* 15 U.S.C. § 1602(p).  This is an independent basis for dismissing the Truth in Lending Act claim.

### b.  Whether Klinger had the authority to make the charge

Even assuming that Klinger's role in the transaction could qualify as a "use of a credit card by a person other than the cardholder," the facts alleged, if proved, show that he was authorized to do so.  By defining "unauthorized" to include actual, implied, and apparent authority, "'Congress apparently contemplated, and courts have accepted, primary reliance on background principles of agency law in determining the liability of cardholders for charges incurred by third-party card bearers.'" *Permobil, Inc. v. Am. Exp. Travel Related Servs. Co., Inc.*, 571 F. Supp. 2d 825, 831 (M.D. Tenn. 2008) (quoting *Towers World Airways, Inc. v. PHH Aviation Sys., Inc.*, 933 F.2d 174, 176-77 (2d Cir. 1991)).  "Under these principles, authority 'is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him.'" *Permobil*, 571 F. Supp. 2d at 831 (quoting the Restatement (Second) of Agency § 7 (1958)).

The Marcottes admit that they authorized Klinger to charge $9,800 charge on their credit card to pay SHR II Luxury Condominiums.  (Docket Entry No. 35, ¶¶ 17, 20-21, 24, 26, 27).  They

19

argue that Klinger lacked authority to make this charge or to pay Sunset Harbor HOA rather than SHR II.  But they authorized Klinger to charge the card to carry out their purchase of the Texas timeshare, which he did.  To the extent that Klinger is a user, the Marcottes authorized him to charge their new credit card to purchase the timeshare.  *See Stieger v. Chevy Chase Sav. Bank, FSB*, 666 A.2d 479, 482-83 (D.C. Ct. App. 1995) ("Nearly every jurisdiction that has addressed a factual situation where a cardholder voluntarily and knowingly allows another to use his card and that person subsequently misuses the card has determined that the agent had apparent authority, and therefore was not an 'unauthorized' user under the Act limiting liability for the cardholder." (citation and quotation omitted)).  This is an independent basis for dismissing the Marcottes' claim against Barclays.

### c.      Whether the Marcottes received a benefit

Even assuming that Klinger used the Marcottes' card and that his use was unauthorized, the facts alleged show that the Marcottes received a benefit in exchange for the charge.  The Marcottes' second amended complaint alleges that they received an ownership interest in the Texas timeshare as early as November 2012, when they received the deed.  They have not alleged that they, as cardholders, "receive[d] no benefit" from the allegedly unauthorized use.  *See* 15 U.S.C. § 1602(p) (requiring that "the cardholder receive[] no benefit" from the challenged transaction).  This is an independent basis for dismissing the claim.

### 4.      Summary of the Motions to Dismiss the Truth in Lending Act Claims

The Marcottes' claim under the Truth in Lending Act against Bank of America is dismissed, without prejudice, for lack of standing.  Their claim against Barclays is dismissed, with prejudice, because the allegations in their second amended complaint do not support an inference that the

transaction was "unauthorized" and further amendment would be futile.

### C.      The Fair Debt Collection Practices Act Claim against Barclays

The second amended complaint alleges that Barclays violated the Fair Debt Collection Practices Act by attempting to collect the $9,800 charged for the Sunset Harbor timeshare after the Marcottes notified Barclays that "this was an unauthorized charge on the card made by Sunset Harbor HOA SA." (Docket Entry No. 35, at 24). "[T]o prevail on an FDCPA claim, [a] plaintiff must prove the following: (1) he has been the object of collection activity arising from a consumer debt; (2) the defendant is a debt collector defined by the [Act]; and (3) the defendant has engaged in an act or omission prohibited by the [Act]." *Browne v. Portfolio Recovery Assocs, Inc.*, 2013 WL 871966, at *4 (S.D. Tex. Mar. 7, 2013). "The [Act] seeks to eliminate 'abusive, deceptive, and unfair debt collection practices' by regulating the type and number of contacts a 'debt collector' can have with a debtor." *Henry v. Chase Home Fin.*, *LLC,* No. CIV.A. H-11-0668, 2011 WL 6057505, at *6 (S.D. Tex. Dec. 6, 2011) (quoting 15 U.S.C. § 1692). "The [Act] defines a debt collector as 'any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.'" *Id.* (quoting 15 U.S.C. § 1692a(6)).

### 1.      Barclays is not a debt collector under the Act

The Marcottes' Fair Debt Collection Practices Act claim fails because Barclays is not a debt collector.   "The [Act] generally applies only to 'debt collectors' and not to 'creditors.' A 'creditor' means 'any person . . . to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of

facilitating collection of such debt for another.'" *Rollo v. Chase Home Fin. LLC*, No. CIV.A. H-12-2914, 2013 WL 1390676, at *3 (S.D. Tex. Apr. 4, 2013) (citing 15 U.S.C.§§ 1692c-1692f; 15 U.S.C. § 1692a(4); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573 (2010)); *see Shamburger v. Grand Casino of Mississippi, Inc.*, 84 F.Supp. 2d 794, 801 (S.D.Miss. 1998) ("The Fair Debt Collection Practices Act does not apply to the actions of a party seeking to collect a debt owed to itself."). Barclays acquired the Marcottes' credit-card account, as well as the unpaid amounts related to the Sunset Harbor timeshare charge, in June 2013 from Bank of America. Barclays is the entity "to whom [the] debt is owed." *See Rollo*, 2013 WL 1390676, at *3. Bank of America did not transfer the Marcottes' debt to Barclays "solely for the purpose of facilitating collection of such debt" for Bank of America. *See id.* Barclays now owns the debt as a creditor, not as a debt collector. *See Robertson v. GE Consumer Fin., Inc.*, No. CIV.A.2:06CVKS-MTP, 2008 WL 4868289, at *3 (S.D. Miss. Nov. 7, 2008) ("[The Fair Debt Collection Practices Act] does not convert legitimate owners of debts into 'debt collectors.' GEMB was the owner of this debt as the creditor, not a debt collector. The same is true of Monogram before it. The plaintiffs have provided no authority otherwise.")

The Marcottes assert that the Act's "false name exception" applies to the collection attempts by Barclays because "[t]he monthly statements that [they] have received from Barclays on the credit card account have been sent to [them] under the name 'RCI'" and "[t]he name 'Barclays Bank PLC' is nowhere to be found." (Docket Entry No. 35, ¶ 83). The false name exception applies to "any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). The exception is meant "to prevent deceit as to who is actually collecting the debt."

*Mazzei v. Money Store*, 349 F. Supp. 2d 651, 658 (S.D.N.Y. 2004) (citing *Maguire v. Citicorp Retail*

*Services, Inc.*, 147 F.3d 232, 236 (2d Cir. 1998)).  The exception "exists to prevent a creditor from

dunning its customers under a false name while maintaining the goodwill associated with the

creditor's actual name." *Cangelosi v. New Orleans Hurricane Shutter & Window, LLC*, 2013 WL

395138, at *5 (E.D. La. Jan. 31, 2013).  It applies if "'a least sophisticated consumer would have

the false impression that a third party was collecting the debt.'" *Id.* (quoting *Mazzei*, 349 F. Supp.

2d at 658).

      The false name exception does not apply in this case.  The billing statement from Barclays

that the Marcottes attach to their second amended complaint could not give the least sophisticated

consumer the false impression that a party unaffiliated with Barclays was collecting their Sunset

Harbor debt.  The billing statement includes numerous references to Barclays, including the

following:

- Powered by Barclaycard;
- www.BarclaycardUS.com;
- To view your most recent transaction activity online, go to www.BarclaycardUS.com;
- Make payments online at www.BarclaycardUS.com;
- barclaycard;
- BARCLAYS;
- Your credit card is issued by Barclays Bank Delaware;
- Both the Minimum Payment Due and Payment Due Date are noted on your statement and on the Accounts page when you login to www.BarclaycardUS.com;
- A "conforming payment" is a payment . . . mailed with a payment coupon printed from www.BarclaycardUS.com.

(Docket Entry No. 35, Ex. C).  Although the billing statement also refers to RCI Elite Rewards,

which the plaintiffs allege is "the largest vacation time share exchange in the world," (Docket Entry

No. 35, ¶ 13), the billing statement clearly instructs the Marcottes to "[m]ake payments online at

www.BarclaycardUS.com."  (*Id.*).  There is no plausible allegation that the least sophisticated

23

consumer would believe that RCI Elite Rewards or any entity other than Barclays was collecting their debt.  Under the Marcottes' approach, a billing statement for a credit card affiliated with an airline, such as United, could subject the creditor to statutory liability merely because of references made to the airline in the billing statement.

The Marcottes argue that the billing statement contains no references to "Barclays Bank PLC."  Although the Marcottes sued "Barclays Bank PLC," not Barclays Bank Delaware, Barclays has consistently represented to the court that this was a mistake.  When Bank of America informed the Marcottes that their credit-card account had been transferred to Barclays, it informed them that the "account was sold to Barclays Bank Delaware," not Barclays PLC.  (Docket Entry No. 35, Ex. B).  In any event, creditors may use the name under which they usually transact business, acronyms or abbreviations that commonly identifies them, or the name they used from the beginning of the credit relationship, as long as it would not mislead the consumer into believing that a separate entity was involved.  *See Rollo*, 2013 WL 1390676, at *4; *see also Suguilanda v. Cohen & Slamowitz, LLP*, 2011 WL 4344044, at *5 (S.D.N.Y. 2011) (rejecting a claim based on a law firm's use of the name "Cohen & Slamowitz, LLP" instead of "Law Offices of Cohen & Slamowitz, LLP" because the names "are substantially similar" and "using both of these names would not confuse the least sophisticated consumer into believing that these are two separate entities"); *Chiang v. Verizon New England Inc.*, 2009 WL 102707, at *7 (D. Mass. 2009) ("A least sophisticated consumer, exercising even a modicum of reasonableness, would not conclude that 'Verizon Massachusetts' was a third party debt collection agency completely unrelated to 'Verizon' or 'Verizon New England, Inc.'").

Barclays is a creditor, not a debt collector, and the Act's false name exception does not apply.  This is an independent basis for dismissing the Marcottes' Fair Debt Collection Practices Act

claim against Barclays.

### 2.  Barclays did not violate the Act

Even if Barclays was a debt collector, the Marcottes' claim nonetheless fails because the facts alleged preclude a finding that Barclays has engaged in an act or omission the Fair Debt Collection Practices Act prohibits.  Section 1692f(1) proscribes the "collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1). The Marcottes do not dispute that they authorized a charge of $9,800 to the Bank of America credit card that they had recently acquired.   (Docket Entry No. 35, ¶¶ 20, 21, 27, 29).  Instead, as discussed above, they assert that they did not authorize payment to Sunset Harbor HOA, but rather SHR II Luxury Condominiums.  The Marcottes' allegations do not plead a violation of the Act.  *See Valdez v. Capital Mgmt. Servs., LP*, 2010 WL 4643272, at *13 (S.D. Tex. Nov. 16, 2010) (rejecting the plaintiff's argument that "because the agreement was invalid due to identity theft, the Defendants were attempting to collect a debt under an invalid contract" and emphasizing that "[s]ection 1692f is primarily concerned with preventing debt collectors from collecting charges greater than the sum that is owed"); *see also Taylor v. Midland Credit Management, Inc.*, 2008 WL 544548, * 4 (W.D. Mich. 2008) ("Accordingly, where the amount being collected by the collection agency was not different than the amount owed, § 1692f(1) was inapplicable to the plaintiff's claim that the collection agency was attempting to collect the debt from the wrong person.").

### 3.  Summary of the Motion to Dismiss the Fair Debt Collection Practices Act Claim

The Marcottes' second amended complaint fails to state a claim against Barclays under the Act.  The claim is dismissed, with prejudice, because further amendment would be futile.

IV.     **Conclusion**

The court grants the motions to dismiss the Marcottes' common-law fraud, Truth in Lending Act, and Fair Debt Collection Practices Act claims filed by Bank of America and Barclays. (Docket Entry Nos. 36, 37). The Marcottes' claim for a declaratory judgment against Bank of America under the Truth in Lending Act is dismissed without prejudice for lack of standing. The Marcottes' remaining claims against both defendants are dismissed, with prejudice, because further amendment would be futile. The Marcottes' state-law claims against the Sunset Harbor defendants are dismissed without prejudice for failure to serve or to prosecute. The order of dismissal is separately entered.

SIGNED on May 11, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

26